JjDUFRESNE, Judge.
These consolidated cases arise from a dispute between Ruth Ann Tessier, the prospective buyer of a house, and Laurence Lambert, its seller, over $52,500 in earnest money deposited with Bonnie Schultz, the seller’s realtor, under the terms of a purchase agreement. The buyer asserted in a concursus proceeding between her and the seller that at the time she signed the purchase agreement she lacked contractual capacity, that the realtor knew or should have known of that incapacity, and therefore that the contract was a nullity, thus entitling her to return of the earnest money. She also brought a separate consolidated action against the realtor for damages allegedly suffered due to the realtor’s inducing her to sign the agreement.
After a bench trial, the trial judge found that the purchase agreement was invalid because Tessier lacked contractual capacity and ordered the earnest money returned to her. He nonetheless ordered Tessier to pay Lambert $10,000 in attorney fees and $1,017.65 in costs. In the consolidated suit, he found that Schultz knew or should have known of Tessier’s mental problems and acted in bad faith in inducing her to sign the purchase agreement notwithstanding this knowledge. Based on these | ^findings, he awarded Tes-sier $11,017.65 in damages against Schultz. Lambert now appeals that part of the con-cursus judgment returning the earnest money to Tessier, and Schultz appeals the damage award against her and in favor of Tessier. Tessier has not appealed the award of attorney fees and costs against her and in favor of Lambert. For the following reasons we set aside the judgment of $11,017.65 against Schultz and in favor of Tessier. In all other respects the matters appealed are affirmed.
Because of our disposition of these appeals we need not recite the facts in detail, as they are well known to the parties. We do note the following particulars, however, as they are essential to understand our disposition of the case.
There is no dispute that Tessier suffers from a bi-polar disorder, a mental condition that manifests itself in manic highs and severe depressions. That condition is controllable by mood stabilizer drugs such as Lithium, but will recur if that medication is discontinued. At the time of the events involved here, Tessier had not taken her medication for several months, and her personality was deteriorating. Two of her friends who testified at trial, Nikki Berger and Martha Sassone, noted that during that period she was nervous, had mixed thoughts, bounced from one subject to the next and was apparently drinking alcohol excessively.
Dr. Alvin Rouchelle, Tessier’s treating psychiatrist, testified about her bi-polar disorder and the potential effects of her not taking her medication. He indicated that without the mood stabilizers she would experience periods of depression alternating with periods of manic highs, and possibly lucid intervals as well. He said that the manic periods could involve overconfidence, impulsiveness, racing thoughts, irritability, excessive energy, halcohol abuse and lack of sleep. When asked if these manic symptoms would be obvious even to a stranger he said that it would be hard to say, but that most people would notice that something was wrong and that the person was different.
Tessier’s husband, Benjamin Birdsall, testified that in the months prior to the events involved in these suits his wife had become argumentative, was drinking excessively, and was acting irrationally at times. The situation had worsened to such an extent that in mid-August he decided to *267 seek a divorce. Birdsall said that the event which precipitated his decision to end the marriage was his wife’s reserving a $1,500 per night room at a downtown hotel for them to spend a weekend together while her school-age daughter was still at summer camp. Birdsall was not sure of the date of this incident, but Tessier said that she thought it was about August 20, 1996. Birdsall testified that during this time he did not have a clear understanding of his wife’s psychiatric problem, and thought that her erratic behavior was due to excessive drinking. He further said that when he decided to file for divorce in August he did not consider where his wife might live during the course of the legal proceedings, nor did he consider having her interdicted. He did assert, however, that he never told her she had to leave their matrimonial domicile on Northline street when he decided on the divorce.
Tessier had a somewhat different recollection. She testified that at the hotel her husband told her not to come to their home again, but she later indicated that they reached an agreement that she could use the house when he was not there. In any case, Tessier and her daughter spent the next week or so staying with family, friends, and at hotels, spent |4one night at the Northline house, and on one occasion spent the night in her car. During this period she saw that the house at issue here on Tokalon Street was for sale. She walked around on the property and looked in the windows of the house but was unable to actually go inside. She contacted Bonnie Schultz, the selling agent, on August 27, told her that she wanted the house, and made a luncheon appointment with her for the next day.
Schultz met Tessier at the Northline house at about 11:00 AM on August 28, to discuss the Tokalon property. At about noon they went to the nearby Metairie Country Club where they met Nikki Berger for lunch. Berger testified that she soon realized that Tessier and Schultz were discussing the house purchase and further that Tessier was about to sign a purchase agreement for a house that she had not yet seen the inside of. She indicated that she was incredulous that someone would buy a house without seeing the inside and so stated to Tessier and Schultz. She also testified that Tessier was “very hyper. She was acting very bizarre, just pretty much crazy, you know, just acting not normal.” Berger also testified that she knew Tessier was manic-depressive and took Lithium for this condition. She said that she assumed that she had stopped taking this medication during the summer because her behavior had become erratic and she was drinking a lot. She did not say whether Tessier was drinking alcohol during the lunch with Schultz. Finally, Berger said that she did not tell Schultz of Tessier’s mental problems, nor did she inform Birdsall about the transaction. Berger left the luncheon after about an hour and knew nothing further.
Schultz testified that Tessier had called her about the house and set | Bup a meeting on the following day. She had met Tessier at the Northline house late in the morning, and perceived her to be a person of means. Schultz was familiar with the Northline property from her experience as a realtor, and estimated the house to be worth three and one-half to four million dollars. They then proceeded to the country club for lunch. Schultz said that during the lunch, as well as during the several hours that she spent with Tessier that afternoon, she did not appear intoxicated and did not drink heavily.
During the lunch, Tessier made an offer on the Tokalon house of $525,000.00, and signed a purchase agreement for that amount. Dining the discussions over lunch Schultz gave Tessier a Louisiana Real Estate Commission disclosure form informing her that she was acting as agent for the seller and setting forth that her duties to Tessier, the buyer, were those of honest and fair dealing and good faith, and to disclose all material facts about the property for sale. Schultz also gave Tessi *268 er Lambert’s property disclosure form setting forth his knowledge of any defects in the property. Schultz said that she explained these documents and that to her knowledge Tessier understood these explanations. At About 3:00 PM Tessier had to pick up her daughter at school, and they then met Schultz at the Tokalon house and went through it.
The document signed by Tessier was a typical agreement to purchase which called for payment of ten percent earnest money, and she wrote out a personal check for that amount and gave it to Schultz. Tessier also indicated that the sale would be for cash and that she would not need any financing because the funds for the purchase would be available due to the impending divorce. Schultz said that because of her domestic [^situation, Tessier wanted to go to an act of sale within three to five days, if possible.
Tessier also asked if it would be possible to list her brother, a real estate agent, as a participating agent so that he could receive a commission on the transaction. Schultz tentatively agreed to this arrangement and placed his name on the agreement, but said that she would have to get the seller to agree as well. Laurence Lambert, the seller, testified that Schultz discussed adding Tessier’s brother as a co-agent and that to do so would raise the expense to him by three percent of the selling price. He said that he had no objection to splitting the real estate commission between two agents, but that if it would cost him an extra three percent, then he would need to get an additional three percent on the selling price from Tessier. Rather than do this, Tessier agreed to have her brother’s name stricken out, and she signed an additional term stating “3% only to Prudential,” Schultz’s brokerage firm. Schultz finally testified that because Tessier wanted a quick closing, the bookkeeper at Prudential informed her that Tessier would have to tender a cashier’s check, rather than a personal check, for the earnest money. Tessier apparently had no difficulty in procuring this check from her bank because on the following day, August 29, she delivered this instrument to Schultz in the amount of $52,500.00, made payable to Prudential.
Although the sale was hopefully to take place within days of the purchase agreement, title work delayed the matter and the closing could not be scheduled until September 13. On that date both Lambert and Tessier appeared, but Tessier had not yet procured the needed funds and asked for a one week extension until September 20, which Lambert agreed |7to. She offered to leave a diamond ring with Lambert as a good faith gesture, but he declined this. On September 20, the parties again appeared and Tessier again asked for a one week extension. On this occasion she produced a reconciliation letter from her husband, but said that she still wanted the house for herself and her daughter. She also said that she had by then discussed the sale with her husband, her brother the real estate agent, as well as with a friend knowledgeable about the law, and all three had informed her that if she did not go through with the sale she would lose the earnest money. Lambert again agreed with an extension until September 27. At no time in either of these meetings did Tessier suggest that she may have been mentally incapacitated when she signed the agreement or that she wanted to get out of the agreement to purchase. Neither did her husband, an attorney, or her brother, a real estate agent, come forward at this time with information about her mental problems even though they were aware of the purchase agreement at least before the September 20, meeting. Lambert testified that at both of his meetings with Tessier she appeared perfectly normal.
Tessier did not appear at the September 27, closing, and on that same date Birdsall, acting as attorney for his wife, wrote to Schultz and Prudential contesting the validity of the purchase agreement, and for the first time indicating that Tessier was *269 suffering from mental problems when she signed the document. In response, Prudential placed the earnest money in the hands of the Louisiana Real Estate Commission, which in turn placed the funds in the registry of the court and commenced the present concursus proceeding. Tessier then brought a separate suit for damages against Schultz, and the matters were consolidated for trial.
| «Because the issues raised in this court are based upon factual determinations made by the trial judge, the standard of review here is whether those determinations were manifestly erroneous or clearly wrong, Stobart v. State through DOTD, 617 So.2d 880 (La.1993). As to the concur-sus proceeding, the codal article applicable to recission of contracts due to incapacity is La. Civ.Code, Art.1925, which provides:
A noninterdicted person, who was deprived of reason at the time of contracting, may obtain recission of an onerous contract upon the ground of incapacity only upon showing that the other party knew or should have known that person’s incapacity.
Thus, to prevail in the district court in the concursus proceeding, Tessier had to show not only that she was deprived of reason, but also that Schultz knew or should have known of this incapacity.
As to Tessier’s suit against Schultz, in order for a purchaser to recover damages against a real estate agent representing a seller, the purchaser must establish either fraud or negligent misrepresentation on the part of the agent, Smith v. Remodeling Services, Inc., 94-589 (La. App. 5 th Cir. 12/14/94); 648 So.2d 995.
In the concursus proceeding, Tessier’s evidence, when considered in light of the entire record, supports a finding that at the time she entered into the purchase agreement she lacked contractual capacity. The testimony of people who knew her was uniform that her behavior had become bizarre and erratic, that she was drinking excessively and that she was unable to concentrate. Further, her treating psychiatrist testified that people with her condition often show grandiose behaviors. In Tessier’s case, it is apparent that she did not have the money to buy the property and had no independent means to acquire these funds. She nonetheless boldly 19entered into an obligation which she evidently thought she could fulfill, and testified at trial that she had actually asked at least two friends with means if they would lend her half a million dollars. Considering this evidence, we can not say that the finding by the trial judge of lack of capacity was manifestly erroneous.
Tessier’s remaining burden was then to show that Schultz either knew or should have known of this incapacity. There was no evidence whatsoever presented to indicate that Schultz had actual knowledge of Tessier’s condition, and the only remaining inquiry is thus whether she should have known of it. The evidence bearing on this point all relates to the time Schultz spent with Tessier on August 28. Tessier said that she had been up most of the night before and had been drinking bloody Marys before Schultz arrived at her house. Berger testified that Tessier’s behavior at lunch was erratic and bizarre, and that in her opinion this strange behavior should have been noticeable even to a stranger. She also found it somewhat incredible that anyone would sign a contract to purchase a $525,000.00 house without so much as seeing the inside of it. It was also shown that Tessier had been staying overnight with various friends and relatives, in hotels, and once in her car with her daughter. On the other hand, Schultz testified that Tessier did not appear intoxicated, did not drink excessively at lunch, seemed to understand everything that was being discussed about the sale, and was focused enough to write out a personal check for the earnest money without hesitation.
Considering the above evidence in light of the entire record, we must conclude that a reasonable trier of fact could have found *270 that Schultz should have realized that something was amiss with Tessier and at least [inhave made further inquiries. While we might well have found otherwise had we been sitting as triers of fact, that is not the applicable standard of review. Rather, the inquiry here is whether the finding of the trial judge is manifestly erroneous considering all evidence of record. Because we are unable to say that he fell into such error, we must affirm the finding that Schultz should have known of Tessier’s incapacity. That being so, recission of the contract and return of the earnest money to Tessier was properly ordered.
The remaining question is whether Schultz was properly cast in judgment. There were no finding that Schultz engaged in fraud or made negligent misrepresentations. Instead, the trial judge found that Schultz was in bad faith in her dealings with Tessier. However, to the extent that bad faith dealings might be construed as fraud and give rise to a cause of action by a seller against a realtor, it is this court’s opinion that the finding of bad faith here was not supported by the record. This finding was based in substantial part on 1) the trial judge’s apparent misunderstanding of the testimony as to any commission Tessier’s brother might receive, 2) his completely unsubstantiated conclusion that Schultz would receive a commission if the earnest money were forfeited and thus that she had an interest in going forward with the agreement to purchase even though she knew it might be voided, and 3) his unsupported speculation that Schultz required Tessier to produce a cashier’s check so that she could not stop payment on it if she later regained her senses.
The misunderstood evidence relates to Tessier’s brother’s name being stricken from the purchase agreement. Tessier had asked whether her brother could be added as a co-agent in the sale in order to receive a [17 commission. The evidence was that Schultz thought that such an arrangement would be possible, but would have to get approval from Prudential as well as Lambert’s consent. Prudential was amenable to a “split commission,” i.e. accepting a commission of three, rather than six, percent on the sale if Tessier’s brother were to also to receive three percent. The problem was that this latter commission would nonetheless come either from Lambert agreeing to pay it from the offer of $525,000.00, or his making a counter-offer of $525,000.00, plus three percent, in which case Tessier would end up paying the three percent to her brother. Moreover, once Schultz and Prudential had agreed to a split commission of three percent, as Lambert’s agents they could not then conceal that fact from him, charge him six percent, and then in effect kick-back three percent to Tessier’s brother. Lambert testified that he would not absorb this three percent and so Tessier’s brother’s name was stricken and Lambert then signed the agreement. Tessier then also agreed to have her brother’s name stricken and simply have Prudential and Schultz receive three percent. The effect of this eventual outcome was that Schultz and Prudential reduced their commission by three percent to their own detriment, but the sale price remained at $525,000.00. To the extent that the trial judge found some sinister motive in this negotiation over the additional three percent commission for Tessier’s brother, he was manifestly erroneous.
Similarly, his conclusion that Schultz was cynically proceeding with the transaction because she would receive a commission whether the contract was rescinded or not is equally erroneous. There is nothing in the record to establish that Schultz would receive any portion of the earnest h ¡¿money were it to be forfeited. The only evidence was instead that she would receive three percent of the selling price only if the sale were completed.
Finally, the findings that Schultz demanded a cashier’s check to take advantage of Tessier, and then, in effect, invent *271 ed her testimony that Prudential requires certified or cashier’s checks for earnest money when deposited less than ten days before a sale, are also clearly wrong. Schultz originally accepted Tessier’s personal check for the deposit and testified that she only requested the cashier’s check when Prudential’s bookkeeping department told her to do so. The cashier’s check was not issued until the day after the purchase agreement was signed, and thus Tessier not only had at least one day stop payment on her personal check were she going to do so, but also was required to take additional action to have her bank issue the new instrument. Again, the fact finder was clearly wrong to find from this evidence relating to the cashier’s check some bad faith effort on the part of Schultz to prevent Tessier from possibly regaining her senses and contesting the agreement.
We further note that there was no allegation of fraud in the petition for damages, and no evidence was introduced to show that Schultz intentionally made misrepresentations as to the property or remained silent as to any material matters so as to gain advantage over Tessier or cause her any loss, as per La. Civ.Code, Art.1953. Neither can we find evidence of any negligent misrepresentation. Schultz provided Tessier with the realtor’s disclosure statement setting forth her agency relationship with Lambert and her duties toward the buyer. The property disclosure form was also presented relating to any known defects in the property. There |13was absolutely no showing that the property was indeed defective, or that it was overpriced at $525,000.00, and it in fact sold some three months later for $498,000.00. Tessier admitted in testimony that Schultz gave her correct information about the house, answered all of her questions, and did not mislead her in any way that she knew of. Moreover, the sale to Tessier did not fail due to anything done by Schultz or involving the condition of the property, but rather because Tessier was unable to produce the funds necessary to conclude the purchase. There was thus no basis in the evidence to support a finding of either fraud or negligent misrepresentation on the part of Schultz, and any such finding by the trier of fact, whether implicit or explicit, was manifestly erroneous. There being no other basis upon which to impose liability on Schultz or her brokerage firm, Prudential Louisiana Properties, we must set aside the judgment against them and in favor of Tessier.
For the foregoing reasons, the judgment in the concursus proceeding ordering that the $52,500.00 in earnest money be returned to Ruth Tessier is affirmed. Because no appeal was taken by Ruth Tessier from that portion of the concursus judgment in favor of Laurence Lambert and against Ruth Tessier in the amount of $11,017.65 in costs and attorney fees, that issue is not before us. In the consolidated proceeding, we hereby set aside the judgment in favor of Ruth Tessier and against Bonnie Schultz and Prudential Louisiana Properties in the amount of $11,017.65, and instead enter judgment in favor of Bonnie Schultz and Prudential Louisiana Properties and against Ruth Tessier, dismissing the matter.

JUDGMENT AFFIRMED IN NO. 99-CA-279.

JUDGMENT SET ASIDE IN NO. 99-CA-280.